and for the appellant is Mr. Montalvo and for the appellee, Mr. Taylor. You may proceed. Thank you, Your Honor. I am pleased to support the counsel. The court has asked that we initially address the apparent discrepancy in the trial court's computation of damages. I'll address that first and briefly based on the nature of the case.  Based on the numbers used by the trial court, it is apparent that the trial court made a computational error based on the numbers that were used, which we don't agree are the correct numbers to have been used on the expense side of the calculation in the first place. The first issue that I had raised in our brief, I'm not going to spend a lot of time on unless the court wants me to amplify on it, that is the admission over objection of the elevator bonus testimony. We'll stand on the arguments in our brief. We have cited what I believe to be the applicable law on the question and stand by the assertion that the second objection was timely made and properly made and that the evidence should have been sustained and the evidence kept out as the court had done when it was first objected to. A major point in dispute in the appeal is what we contend was the clearly erroneous calculation of damages by the trial court. It is submitted that the trial court abused its discretion in that in its analysis of Plaintiff's probable cost to produce the 2003 crop on a per acre basis, several of the expenses associated with Plaintiff's crop production as reported by him in his 2003 tax return and which were not otherwise available because Plaintiff did not segregate those expenses on a farm-by-farm basis in his farming business records. To be clear, we have no dispute with the income side calculation of the equation used by trial court. The dispute stands on the way the trial court calculated the expense side in determining what net profits were lost by Plaintiff due to his inability to farm defendant's 361 acres in 2003. I submit that the court first recognized as important the undisputed fact that Plaintiff was engaged in a farming business in 2003 and the years leading up to 2003 this was a business. As such, Plaintiff's business was not unlike any other business in the sense that it either made a yearly net profit or it sustained a yearly net loss. It is also important to recognize the fact that Plaintiff's farming business consisted of several farms, which up until 2002 encompassed nearly 1,000 acres, of which defendant's farm accounted for 361 acres or roughly 36%. In 2002, the plaintiff lost some farm ground and defendant's 361 acres represented about 42% of the plaintiff's farming business. This fact becomes more important when we look at the way the plaintiff reported his expenses to the IRS, because he did not segregate those expenses by individual farms, he didn't schedule them out separately. He simply combined all expenses and reported them in that manner to the IRS on Schedule F. For example, I spent so much for chemicals, I spent so much for seed, etc. As in any other business, the term net profits has applied to plaintiff's farming business simply means the difference between the gross income generated by the farming operation from the sale of grain and all costs associated with the production of that grain. It is undisputed that in the IRS that his net farm profit for that year was $24,850 and the form at the bottom says net profit for farming, net profit, and he signs that under penalty of perjury. It too is undisputed that in 2003, the year he did not farm below farm, the plaintiff reported to the IRS that his net farm income for that year was $7,510, which parenthetically includes some $15,000 of expenses for non-farming businesses, a veterinary boarding thing and an ironworks thing, which is really, if you were to pull those out and report them in say, for example, Schedule C, which is probably where they should have been, then it would elevate or increase the 2003 net farm profit to about $22,500. Did the defendant present any evidence? With respect to? The cost? Not other than what was reported by the plaintiff in his returns. We have no records available to us other than those that were given to us in their returns. And you wouldn't have known anything about the possible expenses that he might have incurred or might have saved? Well, again, Judge, yes, we do. We clearly know that because that's what he's telling the government in his return. These are my expenses for the year for the farming operation. Now, if we were saying, no, you didn't really spend X number of dollars for seed or no, you did not spend X number of dollars, you're either inflating them or deflating them, then I think it would have been incumbent upon us to say, okay, here's what it should have been. But we're accepting what he told the government. We're saying these were my expenses. We were not challenging those. Does that answer the court's question? So you're just challenging his testimony in court? Pardon me? You're challenging his testimony in court? Well, yes, because the best evidence of what actually was, if he says, I only spent $500, he said, I would have only spent $500 of fuel on the Lowe Farm. We have no way of knowing that. We have no way of testing that. All we do know is that he's farmed six farms and he's spent X number of dollars for fuel. And on a per acre basis, this is what his costs were for the whole entire operation. Now, I would submit that if his whole operation, his business, was strictly the Lowe Farm and not the others, yes, absolutely, we would have had to have gone in there and said that the Lowe Farm would have expended that much. But since, before the other appeal, the court said what Lowe himself spent is not to be considered because he farmed differently, he had no tail, and so on and so forth. So we couldn't present evidence from Mr. Lowe saying this is what this farm would have considered. But he had adjoining farms. He had six farms, I believe, altogether. And he said that in the year 2003, to conduct that farming operation, this is what I spent. And I'm telling the government that this is what I spent. So then we took that and we applied the rule of the Sterling Creek line case. We pulled out the fixed unavoidable expense of depreciation because that's just ongoing. And then we backed up into our formula and said, okay, you spent X number of dollars per acre to farm in 2003. You spent that on the Drake Farm. You spent that on the Felix Farm. You spent that on all other farms. And that's what you would have spent on the Lowe Farm. Now, if he is saying, you know, on the stand, in testimony, years there conveniently without any evidence to back him up, you know, no, I would not have done a hired labor. No, I would not have had any repairs. No, I would not have had anything done. When he, in fact, did report those for the other operations, what we're saying is you have to take it as a holistic view. And that's why we focused on that. We, you know, the discovery, we tried to get the records. And, you know, we were, I was criticized by the trial judge for saying, you didn't bring an expert to say what those costs would have been. He said, Judge, the expert would have said, well, you know, instead of $5,234 for gas, you should have spent $47.84. Or I, in my opinion, the expert would have accepted the numbers that he presented. And based on those numbers, which are the best evidence of what that farm operation was doing, not the one that was doing two counties away or in central Illinois or someplace else in Logan or Mason County or whatever, the expert would have done that. I, in my opinion, and, I mean, it's not part of the record, but I checked into it. I mean, but the fact is that he told us, he told the government, he told the IRS, this is what we're doing. Judge Harris, you know, whom I have a tremendous amount of respect for, stated three reasons why that was not applicable on the record. And in the appeal bargain, too, it's in page 196 and 199. I'm not sure how it translates into the numbers. But he said that there wasn't really any definite testimony separating out what expenses contained in Schedule F were related to his grain farming operation versus some other business venture, close quote. But there was. And he had them itemized. He had the veterinary expenses, he had the ironworks expenses, and we pulled those out when we did our calculation. We pulled those out as we did the depreciation. Then, second, he said, quote, second, there was little or no evidence as to what scheduled items were actually for. For instance, looking at line 15 on the 2003 schedule, it is indicated custom hire. But it doesn't. There wasn't any testimony as to what it had been for. Well, we know what custom hire is because it says. Machine work. And this is, in farming, that's what's hired out. And that's what it's expensed out for. The third reason that he gave is that there was no evidence presented as to what the 2002 expenses in Schedule F related to and whether or not they truly were for grain production that would have resulted in additional costs in Mr. Springfield's farm of 361 acres. Well, given that there were no separate records kept, there was no way other than to look at the entire universe of the farming expenses through the Schedule F and then reasonably improperly to extrapolate those expenses to the entire farming operation. Bottom line on that return, Your Honors, it is presumed, I believe, and I think that this Court should find as a matter of law, that what one puts in his or her tax return and tells the government under oath and threat of perjury that these are my expenses for this operation. Was there some difference between filing the tax return and saying this is what it was and him saying something different in the courtroom? Was he under oath in the courtroom? Yes, he was. Yes, he was. So the question becomes, was he telling the truth in the courtroom or was he telling the truth in the tax return? I didn't go there. To me, when I file a tax return, I know that it is my burden to prove that what is in there is accurate. If I'm in the courtroom under oath and say I think I spent $500 in fuel, I have no way of testing that. What does that mean? Again, I go with the premise, Your Honors, that what you put in the return in a Schedule F is for farming expenses, for the business of farming, and that those expenses are presumed to be accurate and correct. It's a rebuttal presumption. He could have brought in other documents or evidence that said, yeah, but you know what, I went back and this is what I find. I didn't amend the return, but this is the way it is. You couldn't have brought in any evidence? You could not have brought in any evidence? Judge, if I could have, I don't know what that could have been, to dispute the fact that his expenses for gasoline or for, I mean, some of these were the inputs, the seed was established and so on and so forth. But, for example, the insurance, $7,034 for the whole operation, one has to assume the custom hire. The repairs and maintenance, $14,268. What evidence could I have brought in without auditing him like I would the IRS and saying, okay, that's wrong. I don't think that really was our burden to begin with. I think that we accepted what he told the government. I think that one has to assume that that is correct, unless he can come back and say, you know, that was incorrect. What I told the government under oath in threat of perjury was not right, and this is why. But I don't think it was my burden. I don't think it was incumbent upon us to do that. Before my time runs out, I mean, I'll have to expand on this, but here's the thing. The trial court is saying you lost nearly $70,000 in net profits from farming 361 acres in the year 2003. Forget about the fact that you never, historically, ever came close to that. I believe that in 2001, farming 1,000 acres, he made $44,000 net profit according to what he reported. But now, you're going to get a big windfall. As I told a judge in my motion to reconsider, he won the lottery without playing. And so he's going to put $65,000 or $70,000 in his pocket for not farming 361 acres. Where historically, historically, that just doesn't make any kind of sense. It is disproportionate. It is not correct. So I think it just flies in the face of reason. And again, we went through the records that were available, made to us. We came up with our calculations. We figured that perhaps you lost $15,000 or $20,000 on that. In fact, the number, I think, was $14,875 if you throw it into the mix. If McDonald's closes 10% of its stores and their bottom line goes down by 1% or whatever, that's their net loss from that situation. Here, we have the same thing. We have six or seven operations. He lost one. One could lose out of that in the bottom line. And that's what we submit was lost in the bottom line. I think that ignoring and omitting to use the information reported by him in his tax return, I think, was reversible error. I think that if he presents that evidence, and we challenge that evidence. Doesn't that raise a credibility determination that the trial court may have made in terms of, I mean, I understand your position that if you sign it, federal income tax return, I think all of us would say, well, you've got to be right because if you get audited, you're in deep doo-doo. All right? But is it outside the realm of possibility that the trial court looked at the federal tax return, thought it was an absolute fiction, and said, now let's hear the evidence of what the real numbers are? Well, Judge, I suppose one could say that. But in the context, if you read the record in this case, you know, I'm not sure that that is a reasonable inference because we have nothing else. In other words, he can stand there and he can say, you know, my mother paid for the fuel. My cousin paid for the custody and all that. But, Judge, I mean, you know, it's not reasonable. I don't think it's reasonable for the trial court to infer in the context of the numbers and the end result in light of the tax returns, and that all of that then is offset because he said it on the stand. I understand that there's a great deal of latitude in terms of who the court believes or not. You know, and I respectfully disagree with the court on that point. I mean, honestly, there was no other way, there's no other way for us to find any records that even came close to showing what this man did in his business operation, other than what he told the government that he had done. And I think that, again, it is a rebuttable presumption. And the court is saying, well, he said no, so therefore he rebutted the presumption. I suppose that one could take that view. But if one takes that view, then I think one is going down the slippery slope that, you know, when I put my tax returns, don't mean much. And so, therefore, I'm going to escape. I won the lottery, you know, good riddance. And I'm not saying we don't owe the man something. Because we do. But not $66,000 for 30, 361 acres. Anyone who farms, I mean, I don't know a farmer who does that. Maybe the court does, but that's not part of the record. That's just because I represent a lot of farmers. But at the end of the day, Your Honor, that's the position. I think the court clearly, clearly permitted that retirement. Consider those tax returns in its analysis of the damages. Thank you. You'll have additional retirement rebuttal. Thank you, Your Honor.  May it please the court. I think the first thing to consider is the court's order of January 14th, where you ask us to reconcile the computations that the appellate court made with the trial court order. It's easily done. If you look at the top of page 2 of the appellate court calculations, the first section, section 8, and there's a number, $4,141.50. Now, it's not abundantly clear from the trial court's order, but it starts at the bottom of page 195 and goes on for several pages. What the trial court is wrestling with when it comes to this number is the John Stringfield only expenses. So you've got the gross amount of money from the sale of grain less the shared costs. You come up with a number. Do you agree with the trial court's number? Pardon? Do you agree with the trial court's number? Absolutely. I'm getting to that. Yes, ma'am. Then you have the gross revenue less the shared costs, and then the trial court explains at length, considers all these things Mr. Montalvo was arguing about. I think he made all these same arguments before the trial court at least three times. And what it amounts to is the trial court finds that there is a gross amount of money from grain sales, $151,900 something, less the shared expenses. And then you subtract this $41,450 from Mr. Stringfield's side, and you come to the number the trial court came up with, which is $64,534.29. If you lump the $41,450 into the shared expenses, Mr. Stringfield's damages go up by half that amount, which is like $2,070.75. And that's the difference. Basically, the appellate court lumped the Stringfield-only expenses in with the shared expenses. That's the difference between the two numbers, and it's $2,070. So that's the explanation of the difference. The trial court got it right. If Thin Your Wisdom wanted to give my client an extra $2,000, that would be nice, but that's not correct. The trial court, starting on page 195 of the record and going to page 198, went through all of this tax reform stuff. I believe that the trial court probably wrestled with all these arguments and a few things I want to say. The tax return is simply a document prepared to determine how much you owe the unit of government. In this case, the government. Mr. Stringfield didn't do his own returns. He had a professional preparer and stands by his tax return. There's nothing phony or illegal. There was also other businesses lumped in with the farming.  That was the tax preparer's decision. So the tax returns stand, and they're honest. There's nothing wrong with them. I believe that the trial court carefully considered all this stuff, all these arguments, and issued a detailed order. From the bottom of page 195, the last couple lines on, they're talking about the Stringfield-only costs, and it probably didn't make it abundantly clear. We all knew what it was talking about at the time. So I think our brief states our position that the trial court carefully considered all this stuff, heard all these arguments, considered all this evidence, and came to this conclusion. What were the other businesses that were also lumped in with the farming? They paid a lot of iron fencing. There's black iron fencing all around. It's not in the record, but all around. Well, don't tell me about it if it's not in the record. Is there evidence in the record of other businesses? I think there was testimony of that. In fact, yes. Anything besides fencing? It's all sorts of wrought iron stuff. Wrought iron, wrought iron fencing. I believe there's testimony in the record. And like I say, Mr. Stringfield stands by his tax returns. Those were all carefully considered by the trial court. And if the court has no further questions, that's all I have. Well, what are you asking this court to do? Just simply affirm the trial court's decision. And even though the trial court's decision might have been inerrant, you still want that affirmed? I'm sorry? Even though there might have been some calculations that were not correct by the trial court, you want it affirmed as the trial court had determined? No. I believe I explained why the trial court came to the number it did. There's no error in the trial court's computation. Am I correct? You believe the appellate court opinion was incorrect by the $2,070? And 75 cents. Right. Because they lumped the Stringfield-only expenses in with or added to the common expenses, which means that the landlord would pick up half of the $41,000. I think the trial court got it right. You have to admit that the profit that he would be receiving is pretty astounding in light of his tax returns. There's nothing in the record of this, but most farmers... Well, I don't want to hear it. It stands by his tax returns. Tax returns contain all sorts of deductions for ephemeral things such as depreciation, so on and so forth, which is commonplace. There's a huge difference between taxable income in a lot of businesses and cash income. I believe the trial court wrestled with this issue for a long time. I don't think. Judge Harris spent a lot of time and a lot of effort explaining all of this in his opinion. He didn't just sort of go over it and ignore it or whatever. He explained it for some time as to why he... He spent a lot of time explaining why he ruled the way he did. We believe that his opinion should be affirmed. Thank you. Rebuttal? Very briefly, Your Honor. I think that I could not agree with counsel more. He stands by his tax returns. He says that's the correct information. He stands by them. He signed them. He prepared them. He signed them. And so... Well, that's fine to say, but I guess the question that I have anyway is, if you've lumped everything into your farm tax return, have we separated any of this ancillary business out and separated out depreciation, deduction, and so on and so forth? Yes, sir. Yes, sir. In our calculation, we took out... And there are two businesses on the record. There was an ironworks business and there was a stabling, boarding business for horses. And if you look at the 2003 Schedule F, there is a specific line item for ironwork expenses and for veterinary expenses. And we took those out in our calculation. Well, but, you know, veterinary expenses are obviously a big part of a boarding business, but there are other expenses as well, right? He was only... It was just grain, Judge. He did not have a cattle operation at all. And in that line of veterinary expenses, he testified that... Who boarded what? He would board other people's horses. Okay, so I presume not in his house. There's a structure, a barn of some sort. Right. There was a barn, a stable of some sort. So there's electric and all sorts of other expenses associated with boarding business other than veterinary bills. Well, I would grant that. There was no separate meter for the barn. But he did testify that he did have that as a side business. And the same thing with the ironworks. I'm not exactly sure where that was conducted, but he allocated expenses for the ironworks. And I have to assume that he segregated, at least in his own business records, those that were associated with that business. I guess the point is you've got all these ancillary businesses where some of the expenses are inextricably connected to the farming expenses. And how you separate those out from the tax return would be a very difficult task to unravel that yarn ball. Well, and Judge, not to interrupt you, but if you look at the 2002 return where he was farming a little farm in 2002, he did not have ironworks or boarding expenses reported in the Schedule F. And so those are pure farming expenses. And we did that analysis also. And per acre, I think it came down some. But as I stated in my brief, the reason for that was you're spreading the cost over more acres. But we have fewer farm expenses in the 2002 return, which was the last one. And so I think that that... Did he testify that those businesses no longer existed in 2002? I don't think there was any testimony on the 2002, whether or not those businesses existed or not. I don't recall any. So how are we to presume that the businesses didn't have any expense? Well, if they were, they should. They were probably reported in some of the Schedule. They were not reported in Schedule F. Well, you've got the whole 2002 tax return. I did not see anything on that, Your Honor. And, again, focusing on Schedule F, there was nothing reported in Schedule F for those two businesses in 2002. Does the Schedule F form require itemization? If you have, for example, three businesses? No. Schedule F is strictly for farming businesses. And why the ironworks was in there and why the hoarding was in there, I do not know. But if you were to include the expenses for the farm, for the ironworks, and for the sporting business, it would further increase his cost per acre. In our calculation, we took that out. It was to his benefit that we took it out as a depreciation also. So, in fact, we gave him the benefit of the doubt. And we said, okay, we're not going to charge you with that in the return when we do the calculation for damages. So that he, in fact, got that benefit. Even, like the court says, even if there's no evidence, and how they're interrelated, that was given to him. Thank you very much. Thank you, counsel. This matter will be submitted for consideration, and we will stand in review.